Whitaker, Judge,
delivered the opinion of the court:
Plaintiffs bring this action under section 17 (a) of the Contract Settlement Act of 1944 (58 Stat. 665, 41 U. S. C. 117 (a)). In their petition they allege that they secured a loan from the Keconstruction Finance Corporation of $125,000 and invested all of this, together with additional sums of their own, in the purchase of properties containing graphite ore and in the construction of a mill for the production of graphite, all at the instance of the defendant, and with the assurance of the defendant that it would purchase from plaintiffs all the graphite produced by them. They allege that, notwithstanding this, when they offered to sell graphite to the Government, the Government declined to purchase it, and plaintiffs, being unable to dispose of it on the commercial market, had to abandon operations, resulting in a loss of their entire investment.
Defendant denies that any of its representatives agreed to purchase all or any part of plaintiffs’ graphite, and insists that the purchase of the ore-bearing properties and the erection of the mill was done on plaintiffs’ own initiative, although with its encouragement, but without any promise on its part to purchase plaintiffs’ output, or any part of it.
Plaintiffs’ right to recover depends upon whether or not they have proven that an agent of the Government expressly or impliedly promised to purchase their output or any certain part of it, and that this agent had apparent authority to make such an agreement.
Section 17 (a) of the Contract Settlement Act provides as follows:
Where any person has arranged to furnish or furnished to a contracting agency or to a war contractor any materials, services, or facilities related to the prosecution of the war, without a formal contract, relying in good faith upon the apparent authority of an officer or agent of a contracting agency, written or oral instruc *638 tions, or any other request to proceed from a contracting agency, the contracting agency shall pay such person fair compensation therefor.
Plaintiffs allege that one H. F. "Wierum, who was in charge of the graphite section of the Office of Production Management, gave them such assurance.
There is no proof whatever in the record to support this allegation, save only the testimony of W. L. Shumate, who promoted both of the plaintiff corporations, and who became the president of each of them. Mr. Wierum died before this suit was brought. Mr. Eugene H. Dawson, Mr. Wierum’s assistant, who participated in the negotiations with Mr. Shumate, does not support Mr. Shumate’s statement, nor does any other witness with whom Mr. Shumate dealt. There is no written record, by way of memorandum or otherwise, that supports this allegation. On the contrary, the entire testimony, as well as the correspondence between the parties, indicate that the negotiations between Mr. Shumate and Mr. Wierum were not for the purpose of securing an agreement from a governmental agency to purchase the output of the plaintiff corporations; but, on the contrary, was concerned with the securing of a loan for the erection of a mill on the properties, and that the erection of the mill was on plaintiffs’ own initiative.
We are setting out below what the findings show with reference to Mr. Shumate’s dealings with agents of the Government. It will be observed that the matter of the purchase of the output of plaintiff corporations by a governmental agency was never mentioned except by a Mr. Trent, of the Sunshine Mining Company, who stated at a conference between Mr. Shumate and representatives of the Reconstruction Finance Corporation and the Office of Production Management and the Bureau of Mines that his company would finance the erection of a mill on plaintiffs’ property if the Metals Reserve Company would agree to purchase its output; but the findings show that Mr. Trent and Mr. Shumate abandoned this method of financing the undertaking, and that never thereafter was there any suggestion that any governmental agency should agree to purchase plaintiffs’ entire output or any part thereof.
*639 We detail below the history of Mr. Shumate’s dealings with, representatives of the Government in connection with the graphite properties belonging to plaintiffs. He is the only representative of plaintiffs who had any dealings with the Government.
In 1939 Mr. W. L. Shumate, who during World War I had been connected with the business of mining and processing graphite in the State of Alabama, believed that increasing world tensions would result in preparation for war, and perhaps war itself, and would thus create a demand in this country for domestic graphite, since it has an important wartime use in the manufacture of crucibles for steel production.[1] Except in wartime, domestic graphite has never been able to compete with foreign graphite, but Mr. Shumate foresaw the possibility of the foreign supply of graphite being cut off because of the war in Europe. Accordingly, he interested a group of people in the formation of a syndicate to raise $25,000 to form a corporation to acquire certain graphite producing lands in Alabama with a view to going into the graphite business. By February 15, 1941, $24,500 had been subscribed, and $19,575 had been paid in.
In March 1941 Mr. Shumate came to Washington to find out what the Government was planning to do with regard to graphite. At the Office of Production Management, he met the said Mr. Wierum, who was in charge for that agency of all matters relating to graphite. Mr. Wierum expressed interest in the plans of Mr. Shumate’s syndicate and asked whether it was the intention of the members to seek a loan from the Reconstruction Finance Corporation to enable them to build a plant after the desired properties had been acquired. Mr. Shumate stated that such a loan had not been considered.
Whether at that time the syndicate had given consideration to means of financing the erection of a mill does not' appear; but the cost of doing so was being investigated. In April 1941, at Mr. Shumate’s request, the Denver Equipment Company submitted a proposal covering the cost of new machinery for a mill which would have a daily capacity of about 200 tons of ore.
*640 Following bis conversation with Mr. Wierum, Mr. Shu-mate arranged an appointment in May 1941 with Mr. John Norton, Chief of the Mining Division of the Reconstruction Finance Corporation, to explore the possibility of getting assistance from the Reconstruction Finance Corporation. Mr. Norton outlined to Mr. Shumate three possible methods whereby the Government might assist him: (1) a Reconstruction Finance Corporation loan might be granted after sufficient work had been done on the graphite properties to establish whether the quantity and quality of the ore were sufficient to provide the required security for the loan; (2) Defense Plant Corporation might build a plant on the owner’s property and lease it to the property owner, or might lease the mine property, build and operate its own plant, and pay the property owner a royalty on the ore mined; and (3) on the recommendation of the Office of Production Management (later War Production Board), the Metals Reserve Company could enter into contracts to purchase strategic metals and minerals, including graphite.
Mr. Shumate indicated a preference for the Reconstruction Finance Corporation loan plan, since he did not want the Government to have any control over his production. A loan of $200,000 was discussed and Mr. Shumate secured the necessary loan application forms. Mr. Norton suggested to Mr. Shumate that he have trenches dug across the veins of graphite ore so that it could be inspected by a Government engineer, and this was done.
Mr. Shumate advised Mr. Wierum of the results of his conference at the Reconstruction Finance Corporation, and Mr. Wierum asked that Mr. Shumate send him copies of the material assembled to support his loan application.
Plaintiff, the Alabama Flake Graphite Company, was formed on May 22, 1941, as the vehicle for filing the loan application. Copies of assays and other reports which demonstrated a large quantity of high-grade ore were sent to Mr. Norton, of the Reconstruction Finance Corporation, and to Mr. Wierum, of the Office of Production Management, including a report by Mr. Moore, an engineer employed by the company, on the so-called Pocahontas property. The report recommended a plant having a capacity of 400 tons *641 per day. In June 1941 Mr. Moore prepared and sent to Mr. Shumate a flow sheet covering the equipment necessary for a 200-ton a day plant, and this flow sheet was used as the basis for the loan application which was finally filed with the Eeconstruction Finance Corporation on July 14, 1941.
On September 6, 1941, Mr. Norton of the Eeconstruction Finance Corporation informally advised Mr. Shumate by letter that his loan application was going to be turned down because the security offered was not satisfactory. Immediately upon receiving this news, Mr. Shumate went to Mr. Wierum, of the Office of Production Management, to discuss his problem. Mr. Wierum lent his assistance in securing approval of the loan. He requested the Bureau of Mines to publish an advance copy of their report on their investigation of the properties in which Mr. Shumate and his associates were interested, and he made an investigation to see if a development loan could not be secured in the hope that a further exploration of the property would justify the loan to build the plant.
On October 22,1941 Mr. Shumate attended a conference in Washington participated in by representatives of the Office of Production Management, the Eeconstruction Finance Corporation, the Bureau of Mines, and a Mr. Trent of the Sunshine Mining Company. The feasibility of producing graphite from the Alabama properties was discussed, but the Bureau of Mines’ representative stated it was not satisfied as to the availability of sufficient ore reserves. Mr. Trent, of the Sunshine Mining Company, stated that his company would be willing to finance the erection of a graphite plant on Shumate’s properties if a contract for the purchase of the output could be secured from Metals Eeserve Company. In reply the Eeconstruction Finance Corporation’s representative stated that he did not know whether Metals Eeserve Company was then buying graphite, and suggested that Mr. Shumate and Mr. Trent consult the Office of Production Management, which agency had to recommend such a contract before it could be made, to ascertain if a contract could be made with the Metals Eeserve Company to take plaintiffs’ output if a plant were erected on the property with private financing.
*642 The record does not show what Messrs. Shumate and Trent did along this line, but, at any rate, efforts to secure private financing of the project were abandoned.
Mr. Shumate then wrote to Mr. Wierum of the Office of Production Management, telling him of his difficulties and stating that since his efforts to privately finance construction of a plant had failed, he wished to renew his application for a Reconstruction Finance Corporation loan, and asked that the Office of Production Management assist him in having the loan approved by the Reconstruction Finance Corporation.
Mr. Dawson, who had just become Mr. Wierum’s assistant at the Office of Production Management, answered Mr. Shu-mate’s letter and reminded him that Shumate had not yet sent to the Office of Production Management a copy of the report on the ore testings at Pocahontas made by the Denver Equipment Company, nor a copy of their flow sheet, as he had promised to do, which were necessary before a construction loan could be obtained; but he stated that the Office of Production Management would recommend the granting of a $20,000 development loan, if Mr. Shumate wanted to apply for it.[2]
Late in December 1941 Mr. Shumate came to Washington and saw Mr. Dawson and Mr. Wierum and again attempted to persuade them to recommend to the Reconstruction Finance Corporation the granting of a $200,000 loan to build a 300-ton plant. They stated that, although they believed his properties would produce 300 tons a day, the Bureau of Mines did not agree and, therefore, the most they could do for him was to recommend the granting of a loan for $125,000 to build a 100-ton plant. They suggested that Mr. Shumate could later apply for a development loan, in the hope that further exploration might justify increasing the size of the plant to be built and correspondingly the loan.
On January 23, 1942, the loan application was filed for $125,000 to build a 100-ton plant and the War Production Board[3] recommended the granting of the loan.
*643 One of the requirements for the granting of a loan such as the one in question was that the borrower arrange for what was known as a “turnkey job,” which meant that a reputable engineering firm would completely design and erect the plant and guarantee its operation. Mr. Shumate requested that this requirement be waived, and this was done upon Mr. Shumate’s assurance that the necessary flow sheet for the plant would be prepared by the Bureau of Mines’ engineers. The loan was finally authorized on February 20, 1942, by the Reconstruction Finance Corporation. Thereafter, Mr. Shumate sent to Mr. Dawson, of the War Production Board, a copy of the resolution and a letter expressing his thanks for their efforts in helping him secure favorable action on his loan application.
The preparation of the necessary closing papers in connection with the loan was delayed until April 25, 1942, because (1) of the time required by Mr. Shumate in obtaining the necessary abstracts of title, and (2) because of Mr. Shumate’s objections to the requirement that all his properties be mortgaged to secure the loan, and that the company’s capital stock be pledged as collateral security. The Reconstruction Finance Corporation consented to accept a mortgage on the Pocahontas property only, and waived its requirement that the capital stock be pledged.
On March 6, 1942, plaintiffs filed an application with the Reconstruction Finance Corporation for a $20,000 development loan to determine the ore deposits on three other properties, and on May 15, 1942, this loan was granted.
On April 4,1942, Alabama Flake Graphite Company filed with the Division of Priority, War Production Board, its application for the necessary project rating and attached thereto an extensive list of the machinery and materials needed for the project. The application was approved and the project rated A-l-d, with some specific items of machinery rated A-l-c. The flow sheet prepared by the Denver Equipment Company, and approved by engineers of the Bureau of Mines, included a list of equipment and machinery necessary for a 100-ton graphite plant.
On April 17, 1942, plaintiffs filed an application with the Reconstruction Finance Corporation for an installment of *644 $70,000 on the loan. (Subrequisitions had to be submitted covering specific expenditures of the money loaned.) Plaintiffs’ subrequisitions were held up for approval because they included the purchase of items of equipment not listed on the priority application, and for which, therefore, no priority had been granted, and they included also items not appearing on the approved flow sheet.
Mr. Shumate then raised a number of objections to the approved flow sheet. After a conference with the Government’s representatives it was amended by eliminating certain items of machinery objected to by Mr. Shumate, and upon his agreement, on the other hand, to accept the wet screening method provided for therein. After this agreement, requisitions for installment payments on the loan were honored, and the construction of the mill proceeded.
By the end of December 1942 substantially all of the loan of $125,000 had been expended and a substantial additional amount was necessary to put plaintiffs’ plant in operation. With the assistance of the War Production Board, plaintiffs induced the [Reconstruction Finance Corporation to lend them an additional amount of $45,500.
The plant was finally put in operation late in March 1943, but difficulties were immediately encountered in the use of the wet screening process. This process was abandoned in May or June, and a dry screener was substituted therefor.
During the use of the wet screening process, plaintiffs produced graphite concentrate, but which required further processing. This it offered to the [Reconstruction Finance Corporation at 5 cents a pound, to apply on its note of $15,000 due some time in June 1943. This offer was refused. Plaintiffs then tendered the concentrates to the Metals Reserve Company, but they refused to purchase them because ample supplies of foreign graphite had become available and no further purchases of domestic graphite were being made because of the superiority of the foreign supply. This was the first time that plaintiffs had ever undertaken to sell to the Metals Reserve Company any part of their output.
Plaintiffs then undertook to sell graphite on the commercial market, but were able to realize from such sales only about $35,000.
*645 In August 1947 plaintiffs settled for $85,000 their indebtedness to the Reconstruction Finance Corporation of $208,920.52, and plaintiffs discontinued operations.
So far as the written record or oral testimony, except Shumate’s, discloses, the foregoing is the extent of plaintiffs’ dealings with governmental agencies relative to the production of graphite. There is a total lack of any written evidence of any agreement on the part of Mr. Wierum, or of any other official of the Government, to take the output of the mill to be erected on these properties. Mr. Shumate’s testimony that Mr. Wierum agreed to take the entire output of his plant is the only evidence in the record of any such agreement. No other witness present at any of the conferences with any Government official testified to any such agreement.
Such an agreement on the part of any Government agent would have been most improvident. It is inconceivable that it should have been made. All of the written record and all of the oral testimony, except Mr. Shumate’s, shows that the extent of the negotiations between plaintiffs and Government agencies and representatives was to secure the funds to enable them to erect the mill, but there is not a suggestion that the Government bound itself to take the output of the mill. The Government, of course, wanted the mill erected so that it could secure graphite from it, in case it was needed; but the sale of its output to the Government or to any one else was a risk which plaintiffs took. The only suggestion that the Government should take plaintiffs’ entire output was that made by Mr. Trent, of the Sunshine Mining Company, that they would privately finance the erection of the mill if the Metals Reserve Company would agree to take its output; but, as we have stated above, this project fell through.
The Reconstruction Finance Corporation lost $170,000 on the project. It risked its money to enable plaintiffs to erect the mill, but certainly it did not guarantee to take plaintiffs’ output; nor did any other governmental agency.
Not only was there no promise by a Government agent to take plaintiffs’ output, but the whole idea of developing the properties and erecting a plant to produce graphite was plaintiffs’. Before Shumate ever came to Washington, or contacted any Government agent, he had employed an archi *646 tect and a contractor to construct the mill, and a superintendent to aid in its construction and to operate it, and had secured a proposal for the installation of machinery in the plant. It is true that he found that the War Production Board was anxious to see the mill erected, and assisted him in inducing the Reconstruction Finance Corporation to finance the project, but they did not initiate the project; they merely fell in with Shumate’s plans, so far as they could, and assisted him in carrying them out.
This is shown, among other things, by Shumate’s letter to Wierum of the War Production Board after his visit to Washington. He wrote:
Just a line to let you know that we are going ahead preparatory to building a plant on the Pocahontas Property of this corporation so as to be prepared to take care of the graphite requirements of this country. * * *
I appreciate the cordial reception accorded me while in Washington and the interest you have manifested in seeing that American graphite had a fair chance.
It is also shown by his letter of March 4,1942, to Mr. Dawson, after his loan application had been approved. This reads in part:
You have really been a “friend in court” — you have certainly helped us — and you have helped the Government — they need graphite and your attitude and method will get results — you can have what we can offer — we are with you 100%.
Nor does the evidence support the allegation that plaintiffs were required or induced to erect a larger mill than they wanted to erect. On the contrary, it shows that the War Production Board would only recommend a loan of $125,000.00, which was only sufficient for a 100-ton mill, whereas plaintiffs wanted a larger loan in order to erect a larger mill.. At no time had plaintiffs intended to build a mill of less than 100-ton capacity.
We are of opinion that the evidence fails to support the allegation that any Government agent either expressly or impliedly bound itself to take plaintiffs’ output or any part of it, unless it wanted it at the time it was offered.
.The evidence fails to support plaintiffs’ claim and their petition will be dismissed.
*647 Howell, Judge; MaddeN, Judge; Littleton, Judge; and JoNes, OMef Judge, concur.
FINDINGS OF FACT
The court makes findings of fact, based upon the evidence, the report of Commissioner Marion T. Bennett, and the briefs and argument of counsel, as follows:
1. The Alabama Make Graphite Company is a corporation organized under the laws of the State of Alabama on May 22,1941, with its principal place of business at Birmingham. The original authorized capital of the corporation was $2,000, increased on March 10,1942, to $25,000.
The General Graphite Company is a corporation organized under the laws of the State of Alabama on November 6, 1941, with its principal place of business at Birmingham. The original authorized capital of this corporation was $2,000, increased to $10,000 on January 12, 1942, to $20,000 on April 23, 1942, to $40,000 on February 15, 1944, and to $50,000 on July 13,1948.
Mr. W. L. Shumate is a resident of Birmingham, Alabama. Since the dates of incorporation, he has been the president and a director of Alabama Flake Graphite Company and General Graphite Company. Mr. Shumate has, since 1910, been connected with various mining ventures and during World War I had been connected with the business of mining and processing graphite in the State of Alabama.
2. Graphite is an important strategic mineral and its production and use was vitally connected with the prosecution of World Wars I and II. Its most strategic and important wartime use was in the manufacture of crucibles for steel production. Crucible manufacture requires large flakes of a type of graphite known as crystalline. Graphite is also used in lubricants, dry cell batteries, electrodes, carbon brushes, oiler compounds and paints. The Office of Production Management in 1941, and later the War Production Board, classified graphite as a strategic material.
3. The largest and best deposits of crystalline graphite in the world are located in Ceylon, Madagascar, Central Europe, Czechoslovakia, and in Clay County, Alabama. An American domestic graphite industry has never been able to com *648 pete profitably against foreign graphite, particularly that imported from Ceylon and Madagascar. The reasons for this include comparative labor costs, cheap transportation costs from foreign countries, American tariff policies and the fact that foreign ore has a higher graphite content. Domestic graphite, however, becomes essential to the economy when, for reasons of war, foreign supplies are cut off.
4. During World War I, the country experienced a boom in the domestic graphite industry, particularly in and near Clay County, Alabama. Thirty-two plants operated in this area. The best of these properties were found to be and are still the so-called Pocahontas, Alabama, Quenelda, Crucible and Allen properties. During the Second World War the War Production Board considered the Pocahontas property. perhaps the most desirable of these and thought it capable of supporting a graphite milling plant.
5. After the cessation of World War I, the free return to our market of flake graphite from foreign sources, particularly Madagascar and Ceylon, made it impossible for domestic companies to operate profitably, and all of them closed down, including those in which Mr. Shumate was interested.
Late in 1939 Mr. Shumate felt that increasing world tensions might again create a situation in which there would be a demand for domestic graphite, and interested a group of people in the formation of a syndicate to acquire certain graphite-bearing properties.
6. Apparently there had been discussions among at least some of the members of the syndicate about this time as to the possibility of erecting a graphite plant on the property to be acquired by the syndicate.
7. Prior to March 1941, the syndicate hired a qualified engineer, W. L. Moore, who had been familiar with graphite operations in Alabama during World War I, and also hired an architect and contractor to put up the mill. The syndicate also located some of the desired machinery and secured options on it for approximately $2,000.
8. About the middle of March 1941, Mr. Shumate came to Washington to try to find out what the Government was planning to do with regard to graphite. He saw H. F. Wierum, who was in charge of graphite in the Office of Pro *649 duction Management. Mr. Wierum, who died in 1946 and was not available as a witness at the trial of this case, stated that he wanted to find out all that he could .about the possibilities of domestic graphite production in case the emergency required it. He expressed interest in the plans of the syndicate, and asked whether it was the intention of the members to seek a loan from the Eeconstruction Finance Corporation to build a plant after the properties had been assembled. Mr. Shumate stated that the matter of a loan had not yet been considered.
9. In 1940 and 1941, the United States Government, through the Geological Survey, the Bureau of Mines, the Office of Production Management and the War Production Board, was also investigating the quality and quantity of graphite ores in Alabama with the view of establishing a domestic graphite industry. The reason for this inquiry was the growing shortage of graphite. American needs were at least 8,000 tons a year including a supply of 4,000 tons to the British. Due to the war, curtailment of imports had reduced us to only a nine months’ supply by the end of 1941. Until greater domestic production could be started, American monthly production was only 12 to 15 tons. In 1941 and 1942 it was the policy of the Federal Government to encourage the production of domestic graphite.
10. On April 28,1941, Dougles E. Newton, for the Denver Equipment Company, one of the largest manufacturers of mining machinery in the United States, submitted a proposal to the Alabama Flake Graphite Company, at its request, covering the cost of new machinery for a mill which would have a daily capacity of about 200 tons of ore.
11. Early in May 1941 Mr. Shumate returned to Washington to see what could be done about securing a loan from the Eeconstruction Finance Corporation to cover the cost of a plant. An appointment was made for him by one of the Senators from Alabama with John Norton, Chief of the Mining Division, Eeconstruction Finance Corporation. At this conference Mr. Norton explained that the requirements for an EFC loan were very stiff, and the loan had to be well secured, which meant that sufficient work had to be done on the property to establish the quantity and quality of the ore *650 reserves. Mr. Norton also explained tbe activities of tbe two RFC subsidiaries — tbe Defense Plant Corporation, which either built plants and leased them to the property owner or leased the mine property, built and operated its own plant and paid the owner a royalty on the ore mined, and the Metals Reserve Company, which, on recommendation of the Office of Production Management, purchased strategic metals and minerals. Mr. Shumate stated he believed his project would make as good graphite as was brought in from abroad and that he did not want any control over his production. There was discussion about a $200,000 loan to build a plant on the plaintiffs’ property. Mr. Shumate secured the necessary loan application forms and was instructed by Mr. Norton that when he returned home he should have trenches dug across the veins of graphite ore so that it could be inspected by a Government engineer. This was done.
12. Mr. Shumate advised Mr. Wierum of this conference and Mr. Wierum requested that he be furnished with a copy of the material assembled to support the RFC loan application.
13. Mr. Shumate and A. L. Crumpton, an associate, returned to Alabama to prepare the application and open the Pocahontas property for inspection. The plaintiff, Alabama Flake Graphite Company, was formed on May 22,1941, as the vehicle for filing the application. Men were hired to open several veins and clear the property. Assays were taken to determine the quality of the ore. Copies of these assays and other reports which demonstrated a large quantity of high-grade ore were sent to both Norton and Wierum. Mr. Shumate kept Norton informed as to the progress of this work.
14. In the course of the work described above, Shumate requested his engineer, who had worked on graphite production during World War I, to prepare a report on the so-called Pocahontas property, the one in which the syndicate was particularly interested, which would be used as a basis for securing the necessary financing for the plant. In this report, dated May 31,1941, Mr. Moore stated:
I suggest that in building and equipping your new plant you either build a plant having a large capacity, say 400 tons per day or a plant composed of two units, *651 each unit baying a daily capacity of, say, 200 tons each. * * *
15. On May 23,1941, Mr. Shumate wrote to Mr. Wierum of the Office of Production Management, Washington, D. C., the letter reading in material part as follows:
Just a line to let you know that we are going ahead preparatory to building a plant on the Pocahontas Property of this corporation so as to be prepared to take care of the graphite requirements of this country. * * *
I appreciate the cordial reception accorded me while in Washington and the interest you have manifested in seeing that American graphite had a fair chance.
Mr. Wierum replied by letter dated June 3, 1941, that letter reading in part as follows :
I have your letter of May 28, and am greatly interested to know that you are making progress towards the building of a plant on yoUr Pocahontas property.
I wonder if it would be possible, without too much trouble, for you to see me again in Washington in the near future. I will be here all this week, but it is possible that I may be away during the entire week following — that is, the week beginning June 9.
Kindly let me hear from you at your earliest convenience.
Mr. Shumate replied by telegram dated June 6,1941, reading as follows:
ON MY RETURN PROM HAVING ASSAYS MADE BY BUREAU OP MINES AT TUSCALOOSA RECEIVED YOUR LETTER JUNE THIRD. SINCE YOU ARE LEAVING ON NINTH POR A WEEK I AM MAKING MY PLANS TO SEE YOU IN WASHINGTON ON YOUR RETURN AS YOU SUGGESTED.
Mr. Wierum again wrote to Mr. Shumate on June 16,1941, stating that “* * * I am hoping to see you some day this week to talk over the development of some of the graphite mines in Alabama.” Mr. Shumate replied by letter of June 20, stating in part:
I appreciate your letter of the 16th which I found on my return to Birmingham today and regret very much that I am unable to be with you this week.
I have been quite busy the past week figuring with the Denver Equipment people in regard to machinery for our Pocahontas plant. * * *
Hoping to see you in a few days * * *.
*652 16. Mr. Shumate came to Washington sometime between June 20 and June 80,1941. While still in Washington he received from Mr. Moore', whom he had employed as superintendent of his proposed plant, a letter dated June 30, 1941, together with a flow sheet covering the equipment necessary for a 200-ton plant. This flow sheet was used as the basis for the loan application for $200,000 which was filed with the Reconstruction Finance Corporation on July 14, 1941.
17. Under date of September 6, 1941, Mr. Shumate received a letter from Mr. Norton of the Reconstruction Finance Corporation, reading as follows:
The application of your Company for a loan with which to build a graphite mill on your Clay County property has been given careful consideration by the engineers of the Mining Section and I regret to advise you that a loan is not being recommended because satisfactory security for the loan requested is not indicated.
This advice is being sent to you informally at this tinie and within the near future you will receive official notification of this Corporation’s action upon your application for a loan.
The above letter was addressed to Mr. Shumate in Birmingham, Alabama, was forwarded to Chicago and from there to Washington, D. C., where Mr. Shumate finally received it sometime between September 11 and September 15, 1941.
18. On or about September 15,1941, Mr. Shumate met with Mr. Wierum in Washington and discussed with him the proposed denial of his loan application then being considered by the Reconstruction Finance Corporation.
19. Around the time of the meeting on September 15,1941, referred to above, Senator Lister Hill, of Alabama, had made inquiry of Mr. Wierum about the graphite problem in Alabama. Mr. Wierum’s reply, dated September 19,1941, reads as follows:
In response to your letter of September 15th concerning the situation of the graphite problem in Alabama, I would like to detail to you exactly what has been done so far.
As you probably know, the Bureau of Mines, somewhat less than a year ago, sent two of their engineers to examine the graphite field. The report of these engineers is shortly to be published as a bulletin of the *653 Geologic Survey of Alabama entitled “Flotation of Weathered Alabama Graphitic Schists for Crucible Flake.” I have received a manuscript copy of their report, after which we got in touch with Dr. E. E. Sayers, the Director of the Bureau of Mines, reciting to him the efforts that have been made by Mr. Keyton and Mr. Shumate to interest government funds in the development of their properties. We requested him, if possible, to give us a summary of the investigation referred to, including an expression of opinion as to the merits of the mining properties examined. Dr. Sayers was also asked to make a recommendation concerning the best method to pursue in continuing the effort to develop Alabama Graphite.
Mr. Shumate, representing the Pocahontas Mine, had already presented a request to the Eeconstruction Finance Corporation for a loan of $200,000, I believe, with which to build a mill and open and operate that property. This loan was turned down on the ground that there was insufficient knowledge of the proven reserves of graphite and the grade of same. When I learned that the Eeconstruction Finance Corporation had refused this loan on economic grounds," I began an investigation of how money could be raised to further develop these properties and thereby, perhaps, supply the necessary evidence to satisfy the Eeconstruction Finance Corporation concerning tne wisdom and safety of a loan. It was with this in view that Dr. Leith, who is our head minerals consultant, and I requested the Bureau of Mines to make the advance report which I spoke of above. I have now received from the Bureau of Mines, in response to this request, a special report prepared by the two engineers of the Bureau of Mines who made the initial examination. They recommend that four of the twenty-two old mines and outcrops examined be further developed to the end of determining the tonnage and grade of ore in sight and a method of concentrating it into a product acceptable to the graphite crucible industry. These four mines are in Clay County, Alabama, and are known as:
Pocahontas Graphite Co.,
SW %, SW 1/4, Sec. 22, T-20S, E-IE
C. B. Allen Graphite Co.,
SE 1/4, NW i/4, Sec. 20, T-20S, E-IE
Quenelda Graphite Co.,
Sec. 19, T-20S, E-IE
*654 Crucible Flake Graphite Co.,
SW SE %, Sec. 20, T. 20S, R-TE.
These four mines are about sis miles from a railroad and two miles from a highway and are all included within a circle having a radius of one mile. They were selected as having made the best showing in the initial tests made in the examination last winter, and the proposal now is that if the quantity of ore in sight and the quality of the concentrates should warrant it, a mill might be built to which all four properties would be tributary. An expenditure of between ten and twenty thousand dollars is proposed for this examination, but the auspices under which it will be made have not as yet been determined nor has it been decided what arm of the Government, if any, should provide the necessary funds.
I am given to understand that under certain conditions the Reconstruction Finance Corporation is empowered to make a so-called development loan up to $20,000 and I am now trying to ascertain just how this money can be made available.
You will note, of course, that Mr. Key ton’s property is not included in the above four. This is not necessarily because the property is not worthy of development but more likely because its location is not suitable to combine its output with that of the four other mines which have been selected by the Bureau of Mines. This may be called the first gun in the development of the Alabama graphite fields and need not be considered the last unless the new examination is altogether discouraging (which I do not expect to be the case). Inasmuch as1 we have about a year’s supply of Madagascar flake graphite in the hands of distributors and manufacturers in this country, I feel that we have sufficient time to go about this development in a thoroughly safe and scientific manner and that is what the Bureau of Mines proposes to do.
I hope that you will agree that this procedure is wisest and best under the circumstances and assure you that the matter of providing a backlog of graphite from domestic sources to provide against a complete stoppage of the Madagascar product is continuously uppermost in our plans.
20. On his return to Alabama, Mr. Shumate wrote Mr. Wierum a letter dated September 28, 1941, reading in material part as follows:
*655 Well, I just arrived here. I will get busy and see if plan you advised can be worked out. I appreciate what you are endeavoring to do and you can count on me to do what I can on this end of the line. Leaving Washington hurriedly, did not get to write Mr. Norton withdrawing application. Will you please have that application ride without action until I get back last of week. As I explained to you, I don’t want application turned down. You understand, this is very important to me. Will see you last of week.
21. On or about October 1, 1941, Mr. Shumate purchased on the foreclosure sale under a trust indenture issued by Alabama Graphite Company, the lands in Clay County, Alabama, known as the “Alabama Tract,” the “Dixie Property,” the “Landon Property,” and the “Pocahontas Property,” the latter being sold subject to the lien of a mortgage in the amount of $50,000, dated November 24, 1917, executed by Pocahontas Graphite Company, and all of the lands being subject to a purchase money mortgage in the amount of $65,000, dated January 24, 1930, executed by J. F. Berry Baugh. Mr. Shumate paid $225 for these properties in the foreclosure sale.
On or about October 20, 1941, Mr. Shumate purchased the same properties on the foreclosure of the purchase money mortgage executed by J. F. Berry Baugh, referred to above, for the bid price of $50,000. The lands acquired as part of the “Alabama Tract” on this purchase were more extensive than those acquired on the preceding foreclosure sale.[4]
*656 22. After he had completed the purchases on the two foreclosure sales, referred to in the preceding finding, Mr. Shumate returned to Washington where, on or about October 22,1941, he attended a conference of representatives of all of the Government agencies interested in the domestic graphite matter. The Office of Production Management, the Reconstruction Finance Corporation, and the Bureau of Mines were represented here, together with Mr. Shumate and one of his associates and a Mr. Trent, of the Sunshine Mining Company, whom Mr. Shumate had invited to attend. There was discussion at this meeting of the feasibility of producing graphite from the Alabama deposits, and as to the extent of the ore reserves which might be present there. The opinion was expressed by representatives of the Bureau of Mines and the Beconstruction Finance Corporation that there should be further examination as to the extent of the ore reserves which were available. In the course of the discussion Mr. Trent stated he represented the Sunshine Mining Company and that his company was ready to finance the erection of a plant on the plaintiffs’ properties in Alabama if it could secure a contract from Metals Reserve Company for the purchase of the graphite to be produced. Mr. Norton, representing the Reconstruction Finance Corporation, stated that he did not know whether the Metals Reserve Company was then buying graphite, and suggested that this aspect of the matter be discussed with the Office of Production Management.
It was eventually decided that Mr. Shumate and Mr. Trent would conduct further discussions as to the possibility of erecting a plant with private financing and securing a contract to sell its output to the Metals Reserve Company. If this could not be worked out satisfactorily it was understood that Mr. Shumate would probably apply for a development loan to permit further exploration of the ore reserves on his property.
23. Negotiations between Mr. Shumate and Mr. Trent continued for about six weeks, but they were unable to reach any agreement as to the terms upon which Mr. Trent’s clients would provide financing for the erection of a plant.
Under date of December 16, 1941, Mr. Shumate, as presi *657 dent of Alabama Flake Graphite Company, wrote to Mr. Wierum as follows:
Yon will recall at the meeting held in the offices of the B. F. C. on October 22nd it was proposed (1st) that a contract be submitted to the Metals Keserve Corporation to purchase a fixed tonnage of Flake Graphite, and that the building of a plant to produce the graphite be financed by private capital; and (2nd) that if this plan could not be concluded at an early date, an alternative proposal be submitted requesting Government money for the Building of this plant.
This meeting took place over two months ago. We have been unable to privately finance the enterprise on an acceptable basis.
We now wish to take up the second or alternate proposal, that is, to request Government money for the building of a plant to produce graphite.
You already have our application for $200,000 to build and equip a plant that will handle 300 tons of ore per day, which will yield 12 tons of graphite per day or 8,600 tons of graphite per year. 2,000 tons will be Crucible grade and 1,600 tons will be smaller size flake.
Our Application has been pending for five months.
Flow-sheet and list of machinery recommended by Denver Equipment Company accompanied our application, with other full and complete data. Plans and specifications for the buildings also accompanied the application.
The machinery manufacturers, whose experience and ability are beyond question, will furnish an engineer to supervise the installing of the necessary machinery and equipment, and will guarantee its proper operation.
We have submitted to you the records of men in our organization who have installed and operated graphite plants and mines in the area in which our properties are located, but, if their successful records do not meet with your approval, and you desire to name a manager of operations, we will be glad to have you do so, provided we are convinced that the man you name is an experienced graphite plant operator.
The property is known as the Pocahontas. We can five you a first mortgage covering the lands, plants, and uildings proposed.
We also own several properties adjoining and adjacent to the Pocahontas, all of which have been favorably mentioned by all bulletins of the Bureau of Mines. We *658 will place these properties also at the disposal of the Government, if additional plants are desired.
These properties can take care of the entire graphite requirements of the nation, but work should be started right away; each day we wait we will find it more difficult to assemble the machinery and equipment. Prompt action will certainly avert any graphite shortage.
The services of our entire organization and our entire properties are offered to our Government in this present emergency, and we stand ready and anxious to render every assistance possible.
Reputable engineers estimate the tonnage on the Pocahontas at over 2 million tons of ore. The plant we propose will handle 800 tons of ore per day, or 90,000 tons in a year, therefore a 5-year operation would require less than one-half million tons of ore.
We have spent months and a substantial sum of money in our effort to secure favorable action on our application for loan. The RFC has stated they would pass this loan as a Defense measure, at the request of your office. We hope there is something you can do to assist us in expediting this matter.
E. H. Dawson, who had recently come with the Office of Production Management as Mr. Wierum’s assistant, replied to this by letter dated December 19,1941, reading as follows:
I beg to acknowledge the receipt of your letter of December 16th addressed to Mr. H. F. Wierum who has requested me to answer same since I have been in contact with you in the later conferences.
If you will recall at our last meeting you agreed to furnish us with a copy of the ore testing on Pocahontas ores made by the Denver Equipment Company together with their flow sheet. To date we have not received this report. We had expected also to have the results of some preliminary tests of your ore which were to have been made at the Maryland laboratory of the Bureau of Mines. The resultant products were to have been cleaned subsequently by a process of Mr. Trent, but as you know we have not seen or heard from him since our first meeting.
I have discussed the position with Mr. Wierum, and we are both disappointed that you and Mr. Trent could not reach a mutually satisfactory agreement which would have hastened the production of domestic graphite.
*659 As a result of the meeting held October 21st at the office of the Reconstruction Finance Corporation, two propositions were decided upon, as follows:
(a) That Mr. Trent’s or Mr. Shumate’s people would erect the mill with a capacity of 75 tons of ore per day, providing their own capital, if unstated quantities of a definite grade and quality of graphite be purchased by Metals Reserve Company for defense purposes. In case the above could not be consummated — then,
(b) Mr. Shumate should apply for a development loan up to $20,000 for the purpose of fully exploring the quantity of ore in sight on the property.
Now that you have decided to pursue the business yourself and to make an application for a Government loan, said application should be for a development loan up to $20,000 as per proposition No. 2. Such an application will receive the recommendation of this office.
I am sorry not to have seen you before your departure but trust we shall see you soon again in Washington.
24. Late in December 1941, Mr. Shumate returned to Washington to take up personally with Mr. Wierum and Mr. Dawson of OPM the matter of an RFC loan to determine whether or not OPM would recommend to RFC the granting of a $200,000 loan for the erection of a 300-ton a day mill. At that time Mr. Dawson informed Mr. Shumate that in his opinion the ore reserves on the company’s properties had been sufficiently established to justify the erection of a 300-ton a day mill, and that OPM would like to see such a mill built but that the Bureau of Mines engineers were not convinced that the ore reserves were that large, and consequently the RFC would require further proof before loaning funds for a mill having a capacity in excess of 100 tons a day. Mr. Dawson (OPM) stated that under the circumstances his office could only recommend an RFC loan of $125,000 to build a plant on the Pocahontas property having a capacity of 100 tons a day since all concerned were satisfied that adequate reserves had been established on that property to support a plant of at least that size. It was also suggested that Mr. Shumate might wish to apply for an RFC development loan to enable him to conduct exploratory work on his other properties to establish the size of the ore deposits thereon and possibly justify thereby the increasing of the size of the plant to be built.
*660 25. On January 8, 1942, Mr. Dawson as Assistant Chief, Branch K, Materials Division, OPM, wrote to Mr. Shumate as follows:
We shall be prepared Monday or Tuesday, the 12th and 18th, to present your application for a loan for the erection of a 100-ton concentration plant on your Pocahontas mining property.
As you understand, it will be necessary that this property be clear and free of all encumbrances so that the property may be mortgaged for the security of the loan. I understand that it will be necessary for you to go to Birmingham to make the necessary arrangements. Will you please do so at your earliest convenience?
We are also prepared to recommend a prospecting loan for your other properties, namely, Bader, Allen and Quenelda; also known as Alabama Nos. 1,2, and 8. The purpose of the development loan is to prospect and prove sufficient tonnages to justify increase in the capacity of the first plant to be installed. This plant will be so designed that small additional equipment will make it available for from 150 to 300 tons per 24 hours.
26. On January 23, 1942, Alabama Flake Graphite filed with the Eeconstruction Finance Corporation an application for a loan of $125,000 to build a 100-ton plant on the Pocahontas property. ■ In support of this application Wierum and Dawson caused a letter to be sent to the Federal Loan Administrator by the Vice Chairman of the War Production Board, which agency had succeeeded the Office of Production Management on January 16, 1942. This letter, which was dated January 28,1942, read as follows:
In our opinion it is necessary in the interests of the war program to provide milling equipment for the Alabama Flake Graphite Company in order to produce an estimated 1,750 tons of graphite per year. Because the facilities are emergency facilities they will require the help of Government financing and it is our opinion that this should be extended. A memorandum from the chief of the branch responsible for this commodity covering the proposed installation is attached.
I understand that the company in question has applied for a loan with your agency and I hope that satisfactory terms can be arranged to enable it to increase production to the extent indicated in the near future.
*661 In the memorandum justifying the sending of this letter, dictated by Mr. Dawson and signed by Mr. Wierum, the following statements appear:
The Alabama Flake Graphite Company, W. L. Shu-mate, President, is the owner of the Pocahontas mining property. The said company is making application to the Reconstruction Finance Corporation for a loan of not less than $125,000 for the purpose of erecting and operating a graphite milling plant with a capacity of 100 tons of crude ore per day which is estimated to produce 750 tons of flake and 1,000 tons of crystalline dust per year.
In the proposed installation the grinding equipment has a capacity of 150 tons of ore per day, and at small additional expense the entire milling equipment will be expanded to 150 tons per 24 hours, simply by the addition of a few items of equipment at a later date.
A survey of the Alabama graphite-bearing areas made in 1941, jointly by the Alabama Geological Survey and the United States Bureau of Mines, states that the Pocahontas property is one among four of twenty-two properties examined as being the best sources of graphite in Alabama.
A letter from Mr. R. R. Sayers, Director of the Bureau of Mines, states as follows:
Mr. J. R. Thoenen, Senior Mining Engineer, who examined the deposits several months ago on behalf of the Bureau, states that while there is not this quantity in sight, it is certain that there is sufficient material available to operate a mill of this size for two or three years.
The present stocks of Madagascar flake at the present rate of consumption, approximately 400 tons per month, are sufficient for nine months. As soon as the proposed Conservation Orders are in effect there is anticipated a saving of 25%, that is to say, the monthly consumption will be 300 tons.
It is desirable to obtain domestic production as soon as possible to mix with, and eke out, the Madagascar and to be prepared to furnish domestic flake in quantity when the Madagascar flake has been exhausted.
Full information with respect to titles, engineers’ reports, etc., have been presented to the Reconstruction Finance Corporation as of July 14, 1941, their number N. D. 5047.
*662 This branch recommends that said loan be granted so that the production of this essential mineral may be commenced at the earliest possible date.
27. One of the normal requirements of the Reconstruction Finance Corporation on a loan of this type was that the borrower arrange to have what is known as a “turnkey job” done by a reputable engineering firm, whereby the firm would completely design and erect the plant and guarantee its operation. Alabama Flake Graphite Company desired to secure a waiver of this requirement, and on February 13, 1942, while its loan application was still pending at the Reconstruction Finance Corporation, wrote a letter to the Chief of the Mining Section of that organization, reading in material part as follows:
The mill flow sheet has been prepared by Mr. Will H. Coghill of the Tuscaloosa Experimental Station of the Bureau of Mines and the plant design will be prepared by the Denver Equipment Company as soon as the loan has been granted, and the construction of the plant will be in the hands of Mr. Fleming. Messrs. Coghill and Clemmer of the Bureau of Mines will act on milling.[5]
The RFC waived its requirement for a turnkey job upon plaintiffs’ assurance that the Bureau of Mines would prepare the flow sheet and the Denver Equipment Company the plans.
28. On February 20, 1942, the Board of Directors of the Reconstruction Finance Corporation by resolution authorized a loan of not to exceed $125,000 to Alabama Flake Graphite Company for the construction of a 100-ton plant on its Pocahontas property, subject to the terms and conditions therein specified.
Under date of March 4, 1942, Mr. Shumate wrote to Mr. Dawson sending him a copy of the Reconstruction Finance Corporation resolution, and stating in part:
*663 You have really been a “friend in court” — you have certainly helped us — and you have helped the Government — they need graphite and your attitude and method will get results — you can have what we can offer — we are with you 100%.
29. Subsequent to the passage of the EFC resolution of February 20,1942, authorizing plaintiffs’ loan, and before the EFC could prepare and send out the necessary closing papers for execution, plaintiffs were required to furnish the lending agency with abstracts and opinions of title to the property covered by the mortgage securing the loan, the stockholders’ resolution authorizing the execution of the mortgage and notes, and the name of the bank designated by the borrower to act as trustee.
30. It was not until late March 1942 that Alabama Flake Graphite Company submitted to the Eeconstruction Finance Corporation the necessary abstracts and opinions of title [6] as to the property to be covered by the mortgage, and not until April 17,1942, that it designated the bank to act as trustee under the mortgage indenture. There was some question as to whether or not the Alabama properties, Nos. 1, 2, and 3, were to be covered under the mortgage, as well as the Pocahontas property, and this point was clarified at a conference on April 22, 1942, when EFC consented to accept a mortgage on the Pocahontas property only as security. Mr. Shumate also objected to the pledging of all of the company’s capital stock as collateral security for the loan as the EFC resolution provided might be required in the discretion of the Division Chief and Counsel. After a discussion of this matter, the EFC loan official agreed not to require such a pledge.
On April 25,1942, the Eeconstruction Finance Corporation sent out the necessary closing papers for execution. There is no evidence that the delay from February 20 to April 25, 1942, in completing the closing papers was due to the Govern *664 ment’s imposing upon plaintiff any requirements in addition to those specified in the RFC resolution under which the loan was made. On the contrary, the loan officer required less of plaintiffs than the resolution authorized, and the delay in bringing about the closing was the sole responsibility of plaintiffs. The loan was available for withdrawals by plaintiffs early in May of 1942.
31. On March 6, 1942, the Alabama Flake Graphite Company had filed with the Reconstruction Finance Corporation an application for a $20,000 development loan to determine the quantities of graphite on what were known as the Alabama Nos. 1, 2, and 3 properties of the company, the latter two having previously been known as the Rader and Quenelda mines, respectively. This application was granted and the loan approved on May 15, 1942, the resolution providing that the notes to be executed as evidence of the loan shall be “payable from proceeds from operation of Borrower’s mining properties in Clay County, Alabama” and that the loan would be secured by “(1) a lien on the ores and minerals and the proceeds of the sale of such ores and minerals, [and] (2) lien on equipment or other property obtained in whole or in part with proceeds of the loan or of operation of the mining property.”
32. As noted in finding 27, in February 1942, RFC had waived its requirement that Alabama Flake Graphite Company arrange for a turnkey job as a prerequisite to the granting of the loan, upon the understanding that engineers in the Bureau of Mines would prepare the necessary flow sheet. The flow sheet was a schematic diagram of a graphite mill supplemented by a list of the sizes of the machines indicated thereon.
33. Discussions with respect to the proposed flow sheet of the plant had started at a considerably earlier date. The Bureau of Mines had been doing research work at Tuscaloosa, Alabama, on the concentration of Alabama graphite ores since about 1940, and the results of that work were relied on by other Government agencies and by private contractors in setting up their plants. The plaintiffs had been negotiating with representatives of the Denver Equipment Com- *665 party for machinery for their plant, and on January 8,1942, Mr. Moos, a representative of that company met with Mr. Dawson of WPB and Mr. Dasher, a representative of the Bureau of Mines, to discuss the best manner of concentrating the Alabama ores, and particularly those from the Pocahontas property, in the light of the research work which had been done at Tuscaloosa. A flow sheet for a 100-ton plant was agreed upon at that time by the persons at the meeting. On the following day the Denver Equipment Company representative submitted to Mr. Dawson an estimate of the types and cost of equipment which would be necessary, the same to be used as a guide by Dawson in studying plaintiffs’ proposals.
Shortly thereafter, Mr. Moos, the Denver Equipment Company representative who had carried on all his company’s dealings with the plaintiffs after August 1941, visited Tuscaloosa and discussed the matter further with the men who had actually been conducting the research work there, the W. H. Coghill and J. B. Clemmer mentioned by Mr. Shumate in his letter of February 13,1942, quoted in finding 27. As a result of these discussions, Mr., Moos prepared a new flow sheet, based upon the work which had been done at Tuscaloosa.
This experimental work had proceeded in two steps. The first had been the so-called “batch testing” process, in which a relatively small sample of graphite ore, weighing from 250 to 500 grams, was ground, and then the resulting product was subjected to different types of frothing agents, to determine which of them was most successful in separating the graphite flakes from the other materials in the ore. The second step was the erection of a small pilot plant, which would be operated at the rate of 100 to 200 pounds of ore per hour, for periods of continuous operation of six to eight hours. By this process, which resembled a small-scale commercial operation, some 30 or 40 samples of various Alabama ores were concentrated. As a result of this work, new methods of operation were evolved which were more economical than the methods employed during World War I, and at the same time gave a graphite with a higher carbon content and a larger flake recovery.
*666 34. On April 4, 1942, Alabama Flake Graphite Company filed with the Division of Priorities, WPB, its application for a project rating. The application contained an extensive list of “materials needed for project”. Plaintiffs’ application was approved and the project rated A-l-d, with some specific items of machinery rated A-l-c. The record does not establish whether or not the list of machinery and materials needed for the project as listed by plaintiff on its project rating application conformed in all respects with the list of materials and machinery accompanying the flow sheet finally approved and agreed upon by the parties.
WPB regulations prohibited the extension of a particular buyer’s priority rating to items ordered other than those items listed and approved on the buyer’s project rating application.
35. On April 17,1942, Alabama Flake Graphite Company filed its initial application with the Beconstruction Finance Corporation for an advance of the sum of $70,000 under its loan. Under the loan procedure, this only made that aggregate sum available to the company, and subrequisitions had to be submitted covering specific expenditures of the money.
As subrequisitions were submitted under the loan, it became apparent that the company was seeking to purchase various items of equipment not listed on its priority application and for which it, therefore, had no priority, other items of equipment not on the flow sheet prepared by Denver Equipment Company and approved by Coghill and Clemmer, and that with respect to other items of equipment it was selecting apparently at random from various proposals which had been submitted from time to time by the Denver Equipment Company on various bases. The first order submitted to Denver Equipment Company was dated May 16,1942, was for only a few pieces out of an entire plant, and being a selection made from various quotations submitted at different times and in the light of different assumptions, would only accidentally result in a homogeneous and balanced plant.
When this situation came to the attention of Mr. Dawson (WPB), he tried to communicate with Mr. Shumate in order to straighten matters out and to learn just what plans Mr. *667 Shumate had for building his graphite mill. On May 18, 1942, having failed to reach Mr. Shumate by telephone, Mr. Dawson wired Mr. Shumate as follows:
THE E. E. C. INEOEMED ME THE 1GTH INSTANCE YOU HAD MADE REQUISITIONS EOE EQUIPMENT NOT IN THE LIST OF EQUIPMENT ON THE PROJECT EATING AND WHICH COULD NOT BE CHANGED WITHOUT CONSENT OF THE DIVISION ENGINEER. I RECOMMENDED SAME SHOULD BE HELD UNTIL I COULD COMMUNICATE WITH YOU. PLEASE TELEPHONE AT YOUR EARLIEST OPPORTUNITY.[7]
Mr. Dawson confirmed this by letter of the same date, reading in material part as follows:
On my return, I found a telegram from Mr. Coghill stating that Mr. Moore had not considered it necessary to pay the Denver Equipment Company $1,000 for the drawing up of a full set of plans for the Pocahontas mill. Mr Coghill stated that he believed such plans would be positively necessary. * * *
On Saturday, Mr. Mark communicated with me by telephone stating that he had received requisitions from you for equipment not included in your application so therefore these requisitions would be held up until such time as the position may be clarified.
You may have noted in the indenture that no change in plans would be made without the consent of the Division Engineer, namely, Mr. John Norton.
As you will remember, it was due to the fact that the Bureau of Mines was to prepare the flow sheet and that the Denver Equipment Company would draw up the plans for the plant, Mr. Norton agreed not to go through *668 the usual procedure of having a turnkey job made by some prominent engineering company.[8]
Under date of May 20, 1942, Mr. Dawson wrote to Mr. Norton of the Eeconstruction Finance Corporation as follows:
Mr. Wm. Mark has advised us that Mr. W. L. Shumate, Jr., president of the Alabama Flake Graphite Company, has made sub-requisitions under the E. F. C. loan to the Alabama Flake Graphite Company for certain items of equipment, some of which do not appear on the flow sheet as recommended by the Bureau of Mines experimental station in Tuscaloosa.
It is recommended that all requisitions for equipment which are relative to such flow sheet shall be granted but that such items as do not appear on the flow sheet be denied or held until such time as Mr. Shumate has explained to our satisfaction any changes in the flow sheet.
36. Late in May 1942 a conference with respect to the flow sheet was held, attended by representatives of the War Production Board, the Eeconstruction Finance Corporation, and Alabama Flake Graphite Company. Mr. Shumate expressed dissatisfaction with the flow sheet prepared by the Bureau of Mines. Mr. Norton (E. F. C.) suggested that, under such circumstances, it might be better for him to withdraw from the loan project and to allow the plant to be built by Defense Plant Corporation. Eepresentatives of WPB and of plaintiff company stated that they could settle the flow sheet controversy, and Mr. Dawson (WPB) immediately went to Alabama and secured a flow sheet from Mr. Coghill of the Bureau of mines. He transmitted a copy of this to Mr. Norton by letter dated May 29, 1942, reading in part as follows:
I am forwarding you herewith a copy of the flow sheet for the Alabama Flake Graphite Company’s graphite milling plant as prepared by Mr. Will H. Cog- *669 hill, Supervising Engineer of the Bureau of Mines, Experimental Station, Tuscaloosa.
It is to be noted that there are some modifications to the flow sheet of April 26th, due to further test work since that date.
The sizes' of equipment do not accompany the flow sheet but are left to competent designing engineers of the Southwestern Engineering Company, the Denver Equipment Company or others of like ability and standing. Mr. Coghill states and I agree that unless the mill design is prepared by competent men who will provide complete working plans, the flow sheet will be useless.
Under the circumstances of Mr. Shumate’s entire disagreement with the flow sheet of April 26th and may not accept this new one, it is probable that, even though he should accept same he would not use his best efforts to make it work to the best advantage.
Before leaving Washington Mr. Shumate said he would advise Mr. Moore, his mill man and manager, to communicate with me here but as yet I have not heard from him. I shall be in Ashland Sunday and will discuss the new flow sheet with Mr. Moore and possibly with Mr. Shumate who said he would be returning to Alabama after a one day visit in Chicago.
I have been informed that they are proposing to erect the mill building without plans and fit the equipment in afterwards.
It is also said that Mr. Shumate is taking steps to form a graphite syndicate among some other groups who have been doing some prospecting on graphite deposits. I shall check up on these points when in Birmingham and Ashland.
Shortly after this, Mr. Bailey, the sales manager of Denver Equipment Company, also visited Alabama and discussed the flow sheet with Mr. Shumate and other representatives of his office and Mr. Coghill and his associates. On June 8,1942, Mr. Shumate wired to Mr. Dawson as follows:
PLEASED TO ADVISE THAT BAILEY SEEMS TO HAVE WORKED OUT PLOW SHEET WITH BUREAU OF MINES THAT WILL BE ACCEPTABLE ALL PARTIES EXPECT HAVE PAPERS IN YOUR HANDS BY WEDNESDAY.
On the following day Mr. Shumate again wired Mr. Dawson, this telegram reading iii material part as follows:
*670 MAILING YOU flow SHEET ACCEPTABLE BUREAU MINES AND OURSELVES TRUST WILL BE ACCEPTABLE YOU AND MR. NORTON. PLEASE ARRANGE PRIORITIES IN ACCORDANCE MACHINERY LIST ACCOMPANYING FLOW SHEET ALSO ASK RFC TO HONOR OUR REQUISITIONS WHICH WE ARE SENDING jrj\ ít it St
On June 10 Mr. Shumate wrote to Mr. Norton as follows:
Well, at last it looks like we have worked out a flow sheet which is acceptable all around. This flow sheet should enable us to produce a maximum amount of large flake and at the same time give us a good quantity production. * * *
The flow sheet was approved by Mr. Coghill on June 18, 1942, and on June 25 Mr. Shumate was advised that his project was approved upon this basis and to proceed with the necessary requisitions and orders.
37. In the course of the discussions looking to a settlement of the flow sheet controversy, both sides ultimately made concessions. Plaintiffs’ representatives objected to the inclusion therein of a great deal of the grinding equipment recommended by the Bureau of Mines’ engineers, and in response to plaintiffs’ objection, the machinery was eliminated. Plaintiffs also objected to the Bureau of Mines’ recommendation that wet screening be used instead of dry screening. Where the wet-screening method is used, graphite concentrates are screened for size before drying rather than after. During World War I dry-screening operations had been successfully used in the Alabama graphite plants and this was the only method of screening familiar to plaintiffs’ representatives. The wet-screening method had been developed in experimental work done by the Bureau of Mines at Tuscaloosa in an effort to overcome the dust menace always present when graphite was screened dry, and also to permit the use of screens of larger capacity capable of producing graded products of closer size distribution. Although wet screens had been operated successfully in the experimental work at the pilot plant, it had not been successfully used in any commercial milling operation and plaintiffs were strongly opposed to installing the method in their plant. Ultimately, however, plaintiffs consented to use this process.
*671 38. On July 10,1942, Mr. Dawson wrote to Mr. Shumate, his letter, so far as here material, reading as follows:
A meeting was held yesterday with the representatives of the crucible industry as well as the principal distributors, at which meeting was discussed the standardization of screens and classification of domestic graphite.
The U. S. Standard Mesh Screen was selected for the purpose of standardization throughout the industry. The grades established are as follows: No. 1 includes the graphite which stands upon a 50-mesh screen and with certain percentages on No. 20, No. 30, and No. 40, not as yet fully established but will be in accord with the general average of Alabama Graphite. No. 2 — this grade will be that which passes through a 50-mesh screen and stands on 70 mesh. No. 3 will include all — 70 mesh.
So that your screens may be in accord with these specifications, please advise the manufacturers to furnish U. S. Standard Screens of the above meshes. * * *
On July 18,1942, Mr. Dawson wrote Mr. Shumate a further letter which, so far as here material, read as follows:
With further reference to specifications that you have adopted for domestic graphite, please note that four grades have now been established as follows:
Grade No. 1: +50 mesh-13‡ per pound.
Grade No. 2: —50 +70- 110 per pound.
Grade No. 3: — 70 +100_ 70 per pound.
Grade No. 4: —100_ 50 per pound.
The foregoing scales are set up so that the producer will receive a better price for his higher grade products, and that dust would be at such a price that it could be more readily disposed of.
These latter prices were OPA ceiling prices, designed to permit graphite to be sold at its average cost of production (including an allowance for full amortization of the investment over a period of five years), plus a profit of eight percent.
39. In June 1942 Alabama Flake Graphite Company ordered from Denver Equipment Company a complete set of plans for the graphite mill proj ect. As the individual plans for specific portions of the project were completed, they were to be delivered to the Graphite Company.
*672 On August 12,1942, the Denver Equipment Company requested of plaintiffs a map showing the contours east and west of the projected plant site so that it could be sure that the plant would fit into the existing topography. Plaintiffs complied with this request on August 20, 1942.
The first of the project plans were received by plaintiffs about the middle of September 1942, and on September 17, 1942, Mr. Shumate advised Mr. Dawson (WPB) of their receipt in the following terms:
* * * We are just in receipt of plans from the Denver Equipment Company, and they look fine. We have certainly been delayed and have had to stand a long wait, but maybe we will be rewarded after all, as the plans submitted by Denver look like it will produce a real first-class plant. It will be a plant that will give results and everybody will be proud of. * * *
The plaintiffs were procuring their drier from a manufacturer other than the Denver Equipment Company, and in connection with the completion of the plans it was necessary to know the size of the drier so as to design properly the structure surrounding it. Although the Denver Equipment Company first requested this information on October 6, 1942, and thereafter it repeatedly wrote to the plaintiffs for it, and also requested and secured the cooperation of the War Production Board and the Reconstruction Finance Corporation in attempting to expedite its submission, this information was not mailed by the plaintiffs until November 13,1942. The last of the plans for the plant were delivered in March 1943.
The plaintiffs moved slowly in starting construction. For example, one month after receipt of the foundation plans the plaintiffs were just starting to get a concrete mixer to start pouring foundations. Thereafter, the work moved very slowly and uneconomically, with inefficient utilization of labor, excessive amounts of materials, and poor planning of work, resulting in the double handling of materials and machinery.
40. The first machinery for the plant was ordered in June 1942. There were some delays in delivery of complete machinery for the plant, the last shipment being received in February 1943. This delay was due to several different *673 causes. The delays in getting the money made available under the loan and then in straightening out the question of the flow sheet, delayed the placing of the orders for machinery and equipment until a time when the Denver Equipment Company had received orders from other purchasers for the same or similar pieces of equipment which, under the priority regulations, had to be delivered first. Also, the original priority which the War Production Board gave to the plaintiffs was inadequate to allow them to get prompt delivery of all items of equipment which they needed, and during the period of the manufacture of this machinery the priorities of other concerns were increased when the plaintiffs’ were not, tending to divert equipment from the plaintiffs to the other concerns. Another cause of this delay was the plaintiffs’ failure to place some orders with the Denver Equipment Company promptly, to extend priorities to them when received, or to extend priorities in the manner required by the priority regulations.
41. On February 17,1942, the War Production Board had issued Conservation Order No. M-61, placing certain restrictions on the delivery and use of Madagascar flake graphite. On December 4, 1942, this order was amended to apply to all graphite, whether or not imported from Madagascar. It prohibited the delivery of “strategic graphite,” defined in the order as “crystalline graphite (in flake, lump or chip form) that will stand on a No. 50 mesh screen, U. S. Sieve Series,” except to Metals Reserve Company or with the specific authorization of the Director General for Operations, and also placed limitations on the use of strategic graphite.
42. By the end of December 1942, substantially all of the $125,000 loaned by the Reconstruction Finance Corporation, including the amounts designated as being for contingencies and for working capital, had been expended or obligated, and there were still substantial amounts required to put the plant into operation. Expenditures had exceeded the original estimate because of (a) increases in the price of some items of machinery and equipment, (b) the discovery that some items required for the plant had been estimated at too low a figure, (c) inefficient and expensive use of materials and labor in construction, (d) a very heavy overhead charge *674 during tlie periods of delay referred to above, (e) tlie fact that plaintiffs built a 200-ton capacity plant rather than the 100-ton plant contemplated by RFC in making the $125,000 loan to plaintiffs, and (f) the fact that many items of machinery and equipment were ordered by plaintiffs in sizes larger than originally contemplated in order to equip the larger plant which plaintiffs built.
When it became apparent to both plaintiffs and the representatives of WPB that additional funds would be required to complete the project and get the mill in operation, Mr. Shumate had a number of conferences with Mr. Dawson (WPB) about the need for further funds, and on February 6, 1943, plaintiffs applied to RFC for an additional loan of $45,500. On February 19, 1943, this loan was approved.
43. In April, 1943, when there was still an unexpended balance of $8,359.55 under plaintiffs’ $20,000 development loan (finding 31), the RFC refused to approve any further expenditures under that loan. The work done up to that time had revealed large quantities of ore on the properties and it was apparently the attitude of RFC that the primary purpose of the loan had been accomplished. Mr. Shumate protested the RFC action and urged that he be allowed to make further expenditures under the loan to complete the development work and make the usual maps and reports so that there would be a permanent record of the results of the work. RFC did not deem the expenditures for these purposes justified and denied Shumate’s request.
44. The Alabama Flake Graphite Company plant was completed and placed in operation during the latter part of March 1943. Some difficulties arose immediately with the wet screens. The first screens which were supplied appeared to be affected by some acid in the water, and went to pieces very rapidly. They were replaced with stainless steel screens. Difficulties were also experienced with these, resulting from the fact that any screening operation must be adjusted on the job to determine the most effective amplitude and speed of vibration, and slope of the screens, and in the case of wet screening, the degree of dilution of the material going onto the screens and the type and intensity of the sprays. The making of such adjustments in this plant was *675 greatly complicated by the fact that the only provision for handling the “undersize” material which the company had made was the installation of settlement tanks, where the graphite would settle out of the water by gravity, rather than the flotation method used by the Bureau of Mines in its pilot plant and recommended on the flow sheet. These settlement tanks had a very limited retention capacity, which made it impossible to operate the screens continuously and required that they be shut down every 30 minutes or an hour to allow the graphite in the tanks to settle. No attempt was made by the company either to enlarge the settlement tanks or to allow the run-off from the screens to go to waste, either of which would have been possible temporary expedients to allow the screens to be properly adjusted. One cause of the difficulties experienced was that the company had constructed the plant with green lumber sawed on their own property, which had cracked and warped and thrown the screens out of line, resulting in stray vibrations in the screens. The combined efforts of the plaintiffs, interested Government agencies and the suppliers of the equipment were ineffective in making these wet screens work satisfactorily.
In May or June 1943, the company ordered an entirely different type of dry sifter from the Allis-Chalmers Manufacturing Company, which was not delivered until about December 8 of that year.
45. During the period prior to the delivery of the new sifter, Alabama Flake Graphite Company continued operating its plant, producing a graphite concentrate not graded as to size of flake. These so-called concentrates would have required processing other than screening to make them marketable.
In June 1943, the Alabama Flake Graphite Company offered 400,000 pounds of these concentrates to the Reconstruction Finance Corporation at five cents a pounds, to be applied in payment of a $15,000 note then coming due. The officials of the Keconstruction Finance Corporation refused to accept this, on the ground that they had no authority to accept payment in any medium other than cash. The plaintiffs thereupon tendered these concentrates to the Metals Reserve Company, which stated that it could buy graphite only on the *676 request and at the direction of the War Production Board. When the plaintiffs’ officers approached the War Production Board, they were advised that ample supplies of foreign graphite were then coming in, and that for this reason the Metals Beserve Company was not being directed to buy further stocks of domestic graphite.
46. The plaintiffs made some sales of these graphite concentrates in the commercial market, but the market was very limited for that product, and it was further limited by the requirements of Conservation Order M-61, limiting the sale of “strategic graphite.” Since these concentrates contained strategic graphite in undetermined quantities it was necessary to secure the written approval of the War Production Board for each sale. The plaintiffs never made written request for such approvals, but did discuss the matter informally with an official of the War Production Board, who indicated that approval would be granted for sale to a concern which would screen the concentrates. Only a few such sales were made, because purchasers felt that it was too much trouble to comply with the requirements of Conservation Order M-61 on resales. From the time the plaintiffs commenced operations to the end of the war they received $85,759.26 from sales of graphite.
47. After the sifter was installed in the Alabama Flake Graphite plant in December 1943, the plaintiffs successfully manufactured graded graphite, and sought to develop a commercial market for it, but when it found that it was unable to sell its entire production on the domestic market, it tried to sell graphite to the United States, but was unable to do so, since foreign graphite was then in generous supply.
48. On August 2,1947, the Alabama Flake Graphite Company made an offer to the Reconstruction Finance Corporation of $35,000 in full settlement of its entire indebtedness, which, including the accrued and unpaid interest, then amounted to $208,920.52. This included loans of $125,000 and $45,500 for construction of the plant, and. the $20,000 development loan, of which $12,698.19 was actually expended. This • offer was accepted by the Reconstruction Finance Corporation.
*677 Prior to accepting tbis offer, tbe Reconstruction Finance Corporation bad an appraisal made of tbis property by local appraisers. They determined that tbe entire property, including tbe land which was only marginal for agricultural purposes, bad a replacement value of either $200,480 or $205,000, a value for sale as segregated units of either $43,913 or $45,453, and a salvage value of either $19,312 or $21,890. The salvage value of tbe property shown in tbe appraisal was arrived at by assigning only a scrap value for the larger items of machinery and equipment. The record does not establish which, if any, of these figures accurately represented the real value of the plant.
This appraisal was considerably lower than the appraisal made for the plaintiffs as of September 15, 1943, at which time a replacement value of $539,570.24 was placed on all of the Alabama properties owned and controlled by the General Graphite Company, other than its lands, which were valued, on the basis of the estimated ore reserves on them, at $7,754,190.08. The plaintiffs have at no time operated at a profit.
49. The plaintiffs, prior to funds being made available to it by RFC, deposited $3,503.32 into the RFC trust fund.
50. Plaintiff General Graphite Company has expended in connection with this enterprise during the years indicated the following sums:
1941. $524. 82
1942. 929. 53
1943. 6, 327.17
1944. 1945. 8,772.98 11, 515. 58
Total_ 49,070. 08
Plaintiff Alabama Graphite Company has expended in connection with this enterprise during the years indicated the following sums:
1941_$5,779.12
1942_ 3,521.45
1943_ 17,023.28
1944_ 13,204.05
1945_ 32,436.83
Total. 71, 964. 73
*678 The parties produced no evidence as to the reasonableness of the foregoing expenditures.
51. No officer or agent of any contracting agency of defendant ever instructed or requested plaintiffs to proceed to furnish or to arrange to furnish graphite to such contracting agency, nor did any agent of defendant ever promise plaintiffs that their graphite would be purchased by a contracting agency of defendant.
52. In March and April 1948 the plaintiffs filed claims with the Eeconstruction Finance Corporation and the Department of Commerce, as successor to the War Production Board, under Section 17 (a) of the Contract Settlement Act of 1944. These claims were denied by letters dated August 16 and 17, 1948.
CONCLUSION OP LAW
Upon the foregoing special findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiffs are not entitled to recover, and their petition is therefore dismissed.
Judgment is rendered against the plaintiffs in favor of the United States for the cost of printing the record herein, the amount thereof to be entered by the clerk and collected by him according to law.

 Graphite is also used in lubricants, dry cell batteries, electrodes, carbon brushes, oiler compounds and paints.

 A flow sheet is a schematic diagram of a graphite mill supplemented by a list of the types and sizes of machines required.

 On January 16, 1842, the War Production Board succeeded to all the functions of the Office of Production Management.

 On or about November 10, 1941, Mr. Sbumate reconveyed the same properties to General Graphite Company for $100 in cash and the delivery to him of $50,000 in first mortgage purchase money notes of General Graphite Company. This sale also included, as part of the “Pocahontas Property,” a 10-acre tract and a strip of land 30 feet wide. The source of Mr. Shumate’s title to these lands is not shown in the record. Mr. Shumate also acquired certain additional Alabama properties. Because the Alabama Flake Graphite Company was short of funds, Shumate undertook to purchase these properties personally and paid approximately $17,258.16 for them.
On April 10, 1942, Shumate purchased certain property in Alabama known as the “Rainwater Property.” On July 27, 1942, General Graphite Company purchased certain property in Alabama known as the “Tecumseh Property.” On August 20 and 27 and September 29, 1942, Shumate purchased further properties from W. L. Moore, the plant superintendent of Alabama Flake Graphite Company.
On. March 14, 1949, Shumate conveyed all of the foregoing properties purchased by him to General Graphite Company in exchange for its stock of the par value of $30,000.

 The earlier portions of this letter which was addressed to Mr. Norton of RPC, related to the history of the Alabama Flake Graphite Company, the names of the investors and the amounts of their investments. Mr. Norton testified that a Mr. Smith of Metals Reserve Company had expressed interest in the loan application and had inquired concerning the financial structure of the company. Mr. Norton, in turn, had requested Mr. Shumate to supply him with the desired information, and the above letter of February 13, 1942, was in response to that request.

 On February 20, 1942, Alabama Flake Graphite Company owned no real property, and was capitalized for only $2,000. On March 9, 1942, General Graphite Company secured the release of the Pocahontas property from the $50,000 purchase money mortgage described in finding 21, by paying to the trustee under that mortgage the sum of $15,000, and on the same day conveyed that property to Alabama Flake Graphite Company in exchange for capital stock of the latter company of the par value of $23,000, authority for the issuance of such stock actually not being secured until the following day.

 Article V of tile RFC Resolution of February 20, 1942, authorizing plaintiffs’ loan, provided in part as follows :
(3) CONSTRUCTION. After the first disbursement of the loan by RFC Borrower will forthwith undertake the Construction Project and thereafter will pursue and complete the same with all practicable dispatch and diligence, in an efficient and economical manner according to plans and specifications approved by the Division Chief, and any purchase or construction contracts approved by the Division Chief or the Supervising Engineer in accordance with the requirements of the Division Chief.
¡i» # $ sjt #
(6) INCURRING OBLIGATIONS. Unless the Division Chief shall specify to the contrary, Borrower will not accept any work or materials fianeed out of the Construction Fund or Trust Fund * * * without the consent of the Supervising Engineer, and will not purchase, contract for, or incur any obligation or indebtedness for any machinery, materials, equipment, supplies or labor in connection with the Project * * * without the consent of the Supervising Engineer.

 Mr. Coghill was the Bureau of Mines engineer conducting research wort at Tuscaloosa. Mr. Moore was plaintiffs’ engineer who prepared the flow sheet accompanying the first RFC loan application in 1941. Mr. Mark was an engineer in the Mining Section of RFC and plaintiffs’ equipment requisitions were apparently submitted to him for his recommendation as to approval or disapproval to Mr. Norton, Chief of the Mining Section and Division Engineer.